J-S49013-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: G.E.S., PATIENT | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 419 MDA 2018 |

Appeal from the Order Entered February 6, 2018
In the Court of Common Pleas of York County Civil Division at No(s):
2018-MH-000025

BEFORE: SHOGAN, J., STABILE, J., and STEVENS*, P.J.E.

MEMORANDUM BY SHOGAN, J.: **FILED OCTOBER 30, 2018**

Appellant, G.E.S.,[1] appeals from the order denying her petition for review filed under 50 P.S. § 7109(b) of the Mental Health Procedures Act ("MHPA"), 50 P.S. § 7101, *et seq.*, after she was involuntarily committed for treatment pursuant to 50 P.S. § 7303 ("Section 303"). After careful review, we affirm.

The record reveals that on January 24, 2018, Pennsylvania State Police Trooper Cory Heimbach responded to G.E.S.'s house for a welfare check. Section 303 Hearing Transcript, 1/26/18, at 6. When Trooper Heimbach arrived, he discovered G.E.S. sitting unresponsive in a bathtub with a

_____

[1]  The appellee in this matter is the Mental Health-Intellectual and Developmental Disabilities Program of York and Adams County (hereinafter "Appellee").

_____

*  Former Justice specially assigned to the Superior Court.

laceration to the inside of her left thigh. *Id.* Trooper Heimbach eventually was able to wake G.E.S., but she was upset that the Trooper was there and expressed a desire to end her life. *Id.* at 7. Trooper Heimbach had G.E.S. transported to the hospital. *Id.*

Because of G.E.S.'s attempted suicide, Trooper Heimbach filed a petition to involuntarily commit G.E.S. pursuant to 50 P.S. § 7302 ("Section 302") for a period lasting no more than 120 hours. Section 302 Petition, 1/24/18, at 2-3. G.E.S. was involuntarily committed under Section 302 for medical and psychological evaluations. *Id.* at 7.

The Mental Health, Intellectual, and Developmental Disabilities Program of York and Adams County (hereinafter "Appellee"), sought to continue G.E.S.'s involuntary inpatient care pursuant to Section 303. On January 26, 2018, a Section 303 hearing was held before York County Mental Health Review Officer, Victor A. Neubaum, Esquire. At the hearing, Stephen Dilts, M.D., G.E.S.'s physician and psychiatrist at the hospital, testified that G.E.S. told him that she had cut her thigh in a suicide attempt. Section 303 Hearing Transcript, 1/26/18, at 1. Dr. Dilts further stated that G.E.S. informed him that she intended to die, and he concluded that G.E.S.'s wound was potentially life threatening. *Id.* at 2-3. Following an examination, Dr. Dilts recommended involuntary inpatient care for a period not to exceed twenty days. *Id.* at 2.

After review, the Mental Health Review Officer found that there was clear and convincing evidence that G.E.S. met the statutory requirements for

- 2 -

involuntary commitment, and G.E.S. was involuntarily committed. On Friday, February 2, 2018, G.E.S. filed a petition for review in the trial court. The trial court reviewed the audio recording of the January 26, 2018 Section 303 hearing, and on February 6, 2018, the trial court denied G.E.S.'s petition for review. This timely appeal followed. G.E.S. and the trial court have complied with Pa.R.A.P. 1925.

On appeal, G.E.S. raises the following issues for this Court's consideration:

> 1. Whether insufficient evidence was presented at the mental health review hearing to conclude that [G.E.S.] was severely mentally disabled as the hospital failed to prove by a clear and convincing evidence that [G.E.S.] suffered from a severe mental illness.
>
> 2. Whether insufficient evidence was presented at the mental health review hearing to conclude that [G.E.S.] was severely mentally disabled as the hospital failed to prove by clear and convincing evidence that [G.E.S.] attempted suicide, made threats of suicide, committed acts in furtherance of those threats or that she had a reasonable probability of suicide.
>
> 3. Whether the [l]ower court's order for involuntary treatment should be dismissed and [G.E.S.] should be discharged because the record does not support that the hearing and review of the recording on [G.E.S.'s] Petition for Review was commenced within seventy-two (72) hours of the filing of the Petition.

G.E.S.'s Brief at 5.[2]

The standard necessary for an order for emergency involuntary treatment under Section 303 is clear and convincing evidence that a person is

---

[2] We have renumbered G.E.S.'s issues for purposes of our disposition.

severely mentally disabled. ***In re Hancock***, 719 A.2d 1053, 1055 (Pa. Super. 1998). "Severely mentally disabled" is defined, in relevant part, as follows:

> **(a) Persons Subject.-**Whenever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself.
>
> **(b) Determination of Clear and Present Danger.**-(1) Clear and present danger to others shall be shown by establishing that within the past 30 days the person has inflicted or attempted to inflict serious bodily harm on another and that there is a reasonable probability that such conduct will be repeated. If, however, the person has been found incompetent to be tried or has been acquitted by reason of lack of criminal responsibility on charges arising from conduct involving infliction of or attempt to inflict substantial bodily harm on another, such 30-day limitation shall not apply so long as an application for examination and treatment is filed within 30 days after the date of such determination or verdict. In such case, a clear and present danger to others may be shown by establishing that the conduct charged in the criminal proceeding did occur, and that there is a reasonable probability that such conduct will be repeated. For the purpose of this section, a clear and present danger of harm to others may be demonstrated by proof that the person has made threats of harm and has committed acts in furtherance of the threat to commit harm.
>
> (2) Clear and present danger to himself shall be shown by establishing that within the past 30 days:
>
>> (i) the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue

within 30 days unless adequate treatment were afforded under this act; or

(ii) **the person has attempted suicide** and that there is the reasonable probability of suicide unless adequate treatment is afforded under this act. **For the purposes of this subsection, a clear and present danger may be demonstrated by the proof that the person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide**; or

(iii) the person has substantially mutilated himself or attempted to mutilate himself substantially and that there is the reasonable probability of mutilation unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger shall be established by proof that the person has made threats to commit mutilation and has committed acts which are in furtherance of the threat to commit mutilation.

50 P.S. § 7301 (emphases added). Moreover,

**(a) Persons for Whom Application May be Made**.--(1) A person who is severely mentally disabled and in need of treatment, as defined in section 301(a), may be made subject to court-ordered involuntary treatment upon a determination of clear and present danger under section 301(b)(1) (serious bodily harm to others), or section 301(b)(2)(i) (inability to care for himself, creating a danger of death or serious harm to himself), or 301(b)(2)(ii) (attempted suicide), or 301(b)(2)(iii) (self-mutilation).

(2) Where a petition is filed for a person already subject to involuntary treatment, it shall be sufficient to represent, and upon hearing to reestablish, that the conduct originally required by section 301 in fact occurred, and that his condition continues to evidence a clear and present danger to himself or others. In such event, it shall not be necessary to show the reoccurrence of dangerous conduct, either harmful or debilitating, within the past 30 days.

* * *

**(f) Determination and Order**.--Upon a finding by **clear and convincing evidence** that the person is severely mentally disabled and in need of treatment and subject to subsection (a), an order shall be entered directing treatment of the person in an approved facility as an inpatient or an outpatient, or a combination of such treatment as the director of the facility shall from time to time determine. Inpatient treatment shall be deemed appropriate only after full consideration has been given to less restrictive alternatives. Investigation of treatment alternatives shall include consideration of the person's relationship to his community and family, his employment possibilities, all available community resources, and guardianship services. An order for inpatient treatment shall include findings on this issue.

50 P.S. § 7304(a) and (f) (emphasis added) (internal footnote omitted).

The burden is on the petitioner to "prove the requisite statutory grounds by clear and convincing evidence." *In re S.M.*, 176 A.3d 927, 937 (Pa. Super. 2017) (citation omitted). "Our Supreme Court has defined clear and convincing evidence as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *Id.* (internal citation and quotation marks omitted). "In all cases in which the hearing was conducted by a mental health review officer, a person made subject to treatment pursuant to this section shall have the right to petition the court of common pleas for review of the certification. A hearing shall be held within 72 hours after the petition is filed unless a continuance is requested by the person's counsel." 50 P.S. § 7303(g).

In G.E.S.'s first two issues, she avers that the evidence was not sufficient to establish that she was severely mentally disabled and that she had attempted suicide. After review, we conclude that there was ample evidence establishing these factors.

As noted above, Trooper Heimbach testified that when he discovered G.E.S., she was sitting in a bathtub and was unresponsive with a self-inflicted razor cut to her upper thigh. She informed the Trooper that she wanted to die. Section 303 Hearing Transcript, 1/26/18, at 6-7. After G.E.S. was transported to the hospital, Dr. Dilts examined her and spoke to her about her physical and mental health. Dr. Dilts testified that G.E.S. suffered from Major Depression, she cut her thigh in an attempt to commit suicide, and her wound was potentially life threatening. *Id.* at 1-3. Dr. Dilts stated that G.E.S. informed him that it was her desire to die and that, with the loss of her farm imminent, she had no reason to live. *Id.*

G.E.S. asserts that Dr. Dilts's diagnosis of Major Depression did not satisfy fully the definition of Major Depression or Major Depressive Disorder set forth in the Diagnostic and Statistical Manual of Mental Health Disorders, Fifth Edition ("DSM-5"). G.E.S.'s Brief at 20. However, G.E.S. fails to cite any authority that a diagnosis of Major Depression requires the physician to conclude that every DSM-5 criteria is satisfied. As Appellee points out, DSM-5 is not a simple checklist of specific standards used to diagnose mental health disorders; rather, it provides only guidance to physicians. Appellee's Brief at

14-15. Evidence of the fallacy in G.E.S.'s claim is illustrated in the "Use of the Manual" section of DSM-5, which provides as follows:

> The primary purpose of DSM-5 is to assist trained clinicians in the diagnosis of their patients' mental disorders as part of a case formulation assessment that leads to a fully informed treatment plan for each individual. **The symptoms contained in the respective diagnostic criteria sets do not constitute comprehensive definitions** of underlying disorders, which encompass cognitive, emotional, behavioral, and physiological processes that are far more complex than can be described in these brief summaries. Rather, they are intended to summarize characteristic syndromes of signs and symptoms that point to an underlying disorder with a characteristic developmental history, biological and environmental risk factors, neuropsychological and physiological correlates, and typical clinical course.

American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Use of the Manual (5th ed. 2013) (emphasis added).

Accordingly, although Dr. Dilts did not testify that G.E.S. satisfied every symptom of Major Depression set forth in the DSM-5, he did unequivocally diagnose her as having Major Depression based on his observations and the information G.E.S. provided. Section 303 Hearing Transcript, 1/26/18, at 1-3. We discern no error in the trial court's conclusion that Dr. Dilts's testimony was sufficient to support a diagnosis of a severe mental illness, G.E.S. was a clear and present danger to herself, and continued involuntary inpatient treatment was necessary. Trial Court Opinion, 5/8/18, at 2. After review, we find the trial court's conclusion is supported by clear and convincing evidence. 50 P.S. §§ 7301 and 7304.

In her final issue, G.E.S. avers that the order disposing of her petition for review was not entered until four days after the Section 303 involuntary commitment order was entered. G.E.S.'s Brief at 12. As set forth above, generally, a hearing on a petition for review must be held within seventy-two hours after the petition is filed. 50 P.S. § 7303(g). Here, G.E.S. points out that the petition was filed on February 2, 2018, and "it is not clear from the record" when a hearing to review the commitment commenced. G.E.S.'s Brief at 13. G.E.S. avers that this alleged delay should result in dismissal of the commitment order. *Id.* at 15.

The trial court addressed this issue as follows:

[G.E.S.] complains that a hearing or review of the recording was not done within seventy-two (72) hours after she petitioned the [c]ourt for review of the order subjecting her to treatment and, as a consequence, her commitment should be vacated and the hospital records expunged, citing 50 P.S. 7109(b) & 7303; *In re S.O.*, 492 A.2d 727, 342 Pa. Super. 215 (1985); *In re J.K.*, 595 A.2d 1287, 407 Pa. Super. 559 (1991); *In re Ryan*, 784 A.2d [803] at 805, 2001 Pa. Super 28[8 (2001)].

The procedural background of the case is as follows (see docket):

1. January 26, 2018. York Hospital filed an Application for Extended Involuntary Treatment.

2. January 31, 2018. An Order for Extended Involuntary Emergency Treatment—Section 303 was filed, continuing involuntary inpatient care and treatment for a period not to exceed 20 days.

3. February 2, 2018. [G.E.S.] filed a Petition for Review of Mental Health Commitment, stating at paragraph 5, "Petitioner will rely upon the taped testimony of the hearing and will not be present." The petition was filed on Friday at 1:22 p.m.

4. <u>February [5], 2018.</u> The [c]ourt entered an Order, denying the petition for review. The Order was filed … Tuesday[, February 6, 2018,] at 4:13 p.m.[1]

> [1] To the best of the [c]ourt's recollection, it attempted to review the audio recording of the hearing conducted on January 26, 2018 on Monday, February 5, 2018, but the audiotape would not play in the [c]ourt's digital voice recorder, requiring the [c]ourt to secure another audiotape from the mental health review officer on Tuesday.

The implicated statutes provide as follows:

> (b) In all cases in which the hearing is conducted by a mental health review officer, a person made subject to treatment shall have the right to petition the court of common pleas for review of the certification. A hearing shall be held within 72 hours after the petition is filed unless a continuance is requested by the person's counsel.

50 P.S. 7109(b).

> (g) Petition to Common Pleas Court-In all cases in which the hearing was conducted by a mental health review officer, a person made subject to treatment pursuant to this section shall have the right to petition the court of common pleas for review of the certification. A hearing shall be held within 72 hours after the petition is filed unless a continuance is requested by the person's counsel. The hearing shall include a review of the certification and such evidence as the court may receive or require. If the court determines that further involuntary treatment is necessary and that the procedures prescribed by this act have been followed, it shall deny the petition. Otherwise, the person shall be discharged.

50 P.S. 7303(g).

The Court also points out the additional language set forth in the rules governing commitments of 90 days or less, which provides:

- 10 -

(e) Hearings of Petition for Court-order Involuntary Treatment. --A hearing on a petition for court-ordered involuntary treatment shall be conducted according to the following:

> (7) A decision shall be rendered within 48 hours after the close of evidence.

50 P.S. § 7304(e)(7).

The case *sub judice* is distinguishable from *In re S.O.*, *In re J.K.*, and *In re Ryan* as the patient herein waived the review hearing, choosing to rely solely on the audio recording instead.

In *S.O.*, the appellant['s] hearings on the petitions for review were held 52 and 36 days after the petitions were filed as opposed to within 72 hours. *In re S.O.*, 342 Pa. Super. at 228. In *J.K.*, the trial court scheduled a hearing seven days later outside the 72 hour period. *In re J.K.*, 407 Pa.Super, at 560. In *Ryan*, the trial court scheduled a hearing eleven days later. *In re Ryan*, 784 A.2d at 805. In each ease, the appellant did not receive a hearing to review the mental health review officer's recommendation within the mandated 72-hour period, which is not the case here. **The Court "commenced" the hearing when it attempted to listen to the audiotape on Monday, February 5, 2018 and concluded the hearing the following day when it issued its order. In *S.O.*, the Superior Court held that the 72 hours required by Section 109 refers to the time to conduct the hearing and not the time for decision.** *In re S.O.*, 342 Pa. Super. at 230.

The [c]ourt finds the case of *In re J.S.*, 739 A.2d 1068 (Pa. Super 1999), to be instructive regarding the application of the 48-hour rule to render a decision. In *J.S.* the [S]uperior [C]ourt was confronted with the issue of whether application of the time constraint enunciated in Section 7304(e)(7), can logically be applied as a time to be adopted in Section 7303 where a given time for the Judge's determinative review is not set forth. The *J.S.* court stated,

> Where the period of hospitalization is twenty (20) days under § 7303, we see no logic in absence of legislative direction that a prompt judicial decision should not be made within 48 hours after the review

- 11 -

hearing regarding the findings of the mental health Master, if not sooner. By setting this time test in § 7303 we see no disruption in the total view and endeavor sought by the legislature to fix a time for judicial review which can be fairly applied in the interest of the designated mental health agency and the patient. It is clearly as important under § 7303 that a judicial finding be made within 48 hours whether a patient should remain or be released as it is under the conditions of § 7304.

*In re J.S.*, 739 A.2d at 1070. In the instant case, the decision was rendered well within 48 hours of hearing.

In effect *In re J.S.* found that the statute provides for sufficient time to adequately present evidence at a hearing and a reasonable time to pass on such evidence. *Id.*

Trial Court Opinion, 5/8/18, at 2-6.

The trial court opined that the instant case is analogous to ***In re W.A.***, 91 A.3d 702 (Pa. Super. 2014). In ***W.A.***, this Court concluded:

Because the hearing before [the] Mental Health Review Officer … concluded on September 25, 2013, which was a Wednesday, a strict interpretation of subsection (e) required the decision by the trial court to be filed by September 27, a Friday. Although the order was not filed timely, because of the intervening weekend, it was filed on Monday, September 30, the next business day.

W.A. contends that this technical violation requires that the commitment order be reversed and that he be discharged. This Court has categorically rejected a mechanical interpretation of the MHPA. ***See In re S.L.W.***, 698 A.2d 90 (Pa.Super.1997).

In ***In re S.L.W.***, a consolidated appeal, the panel considered a pair of challenges arguing that technical violations involving, among other things, delays in adhering to the timeframe of the MHPA, required vacating of the commitment orders. The panel rejected the arguments that advocated a mechanical application of the MHPA's statutory provisions. The panel explained that

> one of the goals of the Mental Health Procedures Act is to protect the due process interests of the patient who loses his or her liberty by being committed to an institution. Protection of those interests requires fundamental fairness to the patient and respect for the patient's dignity and individuality. Achieving this standard requires common sense application of statutory provisions, not mechanical application. A distinction must be made between those standards that directly affect the due process and liberty interests of the patient and those that do not.

*Id.*, at 94. Moreover, the panel further instructed that "in applying the MHPA we must take a balanced approach and remain mindful of the patient's due process and liberty interests, while at the same time permitting the mental health system to provide proper treatment to those involuntarily committed to its care." *Id.* (footnote omitted).

Here, W.A. has not identified how his due process rights or liberty interests were violated other than the late filing of the order by the trial court. Furthermore, we note that, at the time the Section 304 commitment order was entered, albeit after a one-weekend delay, W.A. was still receiving treatment pursuant to the Section 303, 20-day commitment order entered on September 12, 2013. W.A. suffers from bipolar disorder and mania and, as a result, poses a clear and present danger to himself and others. Thus, W.A. remains a severely mentally disabled individual in need of continued involuntary inpatient treatment. The lack of treatment could lead to serious physical debilitation or death.

The involuntary civil commitment of mentally ill persons constitutes a deprivation of liberty interests, and to justify this deprivation the procedures must satisfy due process protections. *See* 50 P.S. § 7102 ("The provisions of this act shall be interpreted in conformity with the principles of due process to make voluntary and involuntary treatment available where the need is great and its absence could result in serious harm to the mentally ill person or to others."). *See also In re R.D.*, 739 A.2d 548, 554 (Pa.Super.1999). However,

> due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. Due process is flexible and

- 13 -

> > calls for such procedural protections as the particular situation demands.
>
> > *Id.* (quoting ***Mathews v. Eldridge***, 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). Adherence to a strict enforcement of the 48-hour limitation would have ignored the existing Section 303 extended treatment and deprived W.A. of necessary care.
>
> > Accordingly, we refuse to vacate W.A.'s Section 304 commitment on the technical grounds he asserts as it is evident that W.A.'s due process and liberty interests were not affected by the short delay and his continued needed commitment.

***In re W.A.***, 91 A.3d 702, 704-705 (Pa. Super. 2014) (footnote omitted).

Here, G.E.S. filed her petition for review on Friday, February 2, 2018. The trial court noted that on Monday, February 5, 2018, it attempted to review the recording of the January 26, 2018 hearing, but it was unable to complete its review due to an issue with the court's voice recorder. Trial Court Opinion, 5/8/18, at 3 n.1. Thus, the trial court points out that it "commenced" its review of the January 26, 2018 hearing on the first business day, February 5, 2018, following the February 2, 2018, filing of G.E.S.'s petition. The trial court then completed its review and entered an order on February 6, 2018. We are satisfied that the trial court complied with the decision in ***S.O.***, commenced its review of G.E.S.'s petition within seventy-two hours as required by Section 109, and rendered a timely decision without any unreasonable delay. Accordingly, we discern no error.[3]

_____

[3] Assuming, for the sake of argument, that the trial court did not commence its review until February 6, 2018, the day the order was filed, we would

- 14 -

For the reasons set forth above, we conclude that G.E.S. is entitled to no relief on appeal. Accordingly, we affirm the February 6, 2018 order.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/30/2018

---

conclude that the one-day delay did not deprive G.E.S. of due process. Rather, we would still affirm the order pursuant to the rationale in *W.A.* wherein this Court refused to vacate a commitment on due process grounds where there was a short delay in the trial court's review. *W.A.*, 91 A.3d at 705.